CANADY, C.J., dissenting.
 

 I disagree with the majority's decision to quash the First District's decision in
 
 Morris v. Muniz
 
 ,
 
 189 So.3d 348
 
 (Fla. 1st DCA 2016), and to reinstate Morris's medical malpractice complaint against the various defendants in this case. I would instead approve the result reached by the First District. Under a proper reading of the statutes governing the medical malpractice presuit process, Morris's purported presuit "medical expert"-Dr. Thompson-as a matter of law did not satisfy the statutory requirements for such experts. Accordingly, I dissent.
 

 This case is readily resolved on the ground that Dr. Thompson failed to meet the threshold statutory requirement of being "duly and regularly engaged" in the practice of the profession at the time the presuit affidavit was executed in 2011. § 766.202(6), Fla. Stat. (2011). The record reveals that at the time Dr. Thompson executed the affidavit, she had been retired from her OB/GYN practice for more than three years and by all indications had transitioned (or was transitioning) into a new career. The fact that Dr. Thompson had a lengthy career as an OB/GYN before retiring in March 2008 does not defeat the plain language of the relevant statutes.
 

 After examining the statutory requirements for a presuit "medical expert" and explaining why Dr. Thompson does not satisfy those requirements, I briefly address the problematic nature of Dr. Thompson's affidavit and the ensuing lack of compliance by the plaintiff and plaintiff's counsel regarding the trial court's order authorizing limited discovery into Dr. Thompson's qualifications. Given this record, I am troubled by the majority's decision to view this case through the lens of an "unrefuted" affidavit. The true extent of Dr. Thompson's activities before March 2008 are unknown. Thus, even assuming that the "duly and regularly engaged" requirement applies to some period of time prior to March 2008, I would approve the First District's decision to affirm the dismissal of the lawsuit.
 

 I. DR. THOMPSON WAS NOT A "MEDICAL EXPERT" FOR PURPOSES OF CHAPTER 766
 

 Prior to filing a claim for medical malpractice, a prospective plaintiff is required to "conduct an investigation to ascertain that there are reasonable grounds to believe that" the named defendant was negligent and that the negligence caused the plaintiff's injury. § 766.203(2), Fla. Stat. (2011). As part of the mandatory presuit process, a prospective plaintiff must obtain "a verified written medical expert opinion from a medical expert as defined in s. 766.202(6)."
 

 Id.
 

 The purpose of the expert opinion is to "corroborate reasonable grounds to support the claim of medical negligence."
 

 Id.
 

 Prior to initiating litigation, the prospective plaintiff must first provide the defendant with a "notice of intent to initiate litigation," along with the medical expert's opinion.
 

 Id.
 

 The term "medical expert" is defined in section 766.202(6) as "a person
 
 duly and regularly engaged
 
 in the practice of his or her profession who holds a health care professional degree from a university or college and who meets the requirements of an expert witness as set forth in s. 766.102." (Emphasis added.) There is nothing
 backward-looking about the present-tense requirement that the person be "duly and regularly engaged" in the practice of the profession. In other words, the person must
 
 be
 
 duly and regularly engaged in the practice at the time the written medical expert opinion is offered, as opposed to having been duly and regularly engaged in the practice during some earlier period. But this "duly and regularly engaged" requirement, of course, is not the only statutory requirement for being a "medical expert." Section 766.202(6) expressly provides that the person must also hold a certain professional degree
 
 and
 
 "meet[ ] the requirements of an expert witness as set forth in s. 766.102."
 

 Section 766.102 sets forth requirements for testifying experts in medical malpractice actions. In order to be an expert witness permitted to testify concerning the prevailing professional standard of care, the witness must, at a minimum, be a licensed health care provider. § 766.102(5), Fla. Stat. (2011). For giving expert testimony against a specialist, the expert witness must meet certain additional requirements, including that the witness "[s]pecialize in the same specialty as the health care provider against whom ... the testimony is offered." § 766.102(5)(a) 1., Fla. Stat. An expert witness offering testimony against a specialist must also meet a specific, backward-looking requirement. Namely, the expert witness must:
 

 2.
 
 Have devoted professional time during the 3 years immediately preceding the date of the occurrence that is the basis for the action to
 
 :
 

 a. The active clinical practice of, or consulting with respect to, the same or similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients;
 

 b. Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same or similar specialty; or
 

 c. A clinical research program that is affiliated with an accredited health professional school or accredited residency or clinical research program in the same or similar specialty.
 

 § 766.102(5)(a) 2., Fla. Stat. (emphasis added).
 

 When reviewing the distinct requirements of sections 766.202(6) and 766.102 together, it is clear that the Legislature focused on both the ongoing and previous experience in practice of a presuit "medical expert." The statutory requirements are "clear and unambiguous" and should be given their "plain and obvious meaning."
 
 A.R. Douglass, Inc., v. McRainey
 
 ,
 
 102 Fla. 1141
 
 ,
 
 137 So. 157
 
 , 159 (Fla. 1931). Thus, in this case involving a medical specialty, Dr. Thompson at the time she executed the affidavit was required to: (1) be duly and regularly engaged in the practice of the profession; and (2) "[h]ave devoted professional time during the 3 years immediately preceding the" alleged malpractice to one of the three categories of professional activities listed in section 766.102(5)(a) 2.-under the facts presented here, to "[t]he active clinical practice of" OB/GYN.
 
 [8]
 

 Nothing in Dr. Thompson's affidavit or in the rest of the record supports the conclusion that she was "duly and regularly engaged" in the practice of the profession at the time she executed the affidavit in 2011. Dr. Thompson's affidavit on its face paints the picture of someone who retired in March 2008 from a lengthy private medical practice and who had transitioned (or was transitioning) into a new career. That conclusion is supported by the rest of the record, including the following interrogatory response from the plaintiff regarding Dr. Thompson's profession or occupation: "Retired OB/GYN, March 1, 2008, before law practice." Although Dr. Thompson maintained an active license to practice medicine in the State of Texas at the time she executed the affidavit, that license merely
 
 authorized
 
 her to engage in the practice of the profession. Indeed, having an active license is itself a separate statutory requirement for a "medical expert." § 766.102(5), Fla. Stat. And although Dr. Thompson mentioned during her deposition in October 2013 that she served as an expert for the Texas Board of Medicine after her retirement from private practice, serving as an expert can hardly be said to be "engag[ing] in the practice of" the profession. § 766.202(6), Fla. Stat.;
 
 see
 

 Winson v. Norman
 
 ,
 
 658 So.2d 625
 
 , 626 (Fla. 3d DCA 1995) (concluding that the alleged presuit expert who "confined his recent professional activities to acting as a 'litigation expert' " did not satisfy the requirement in chapter 766 of being duly and regularly engaged in the practice of the profession). In any event, Dr. Thompson described her work for the Texas Board of Medicine as "sporadic," which is quite the opposite of "regularly." In short, Dr. Thompson was not a qualified "medical expert" for purposes of chapter 766. As a result, her affidavit was insufficient to "corroborate reasonable grounds to support the claim of medical negligence." § 766.203(2), Fla. Stat.
 
 [9]
 

 The majority's repeated assertions that Dr. Thompson "clearly met" the statutory requirements,
 
 see
 
 majority op. at 1157, 1161, cannot be reconciled with the plain statutory language. And no case law supports allowing a medical malpractice lawsuit to proceed where, as is the case here, the plaintiff fails to provide the requisite corroborating affidavit prior to the expiration of the limitations period for filing suit.
 
 See
 

 Kukral v. Mekras
 
 ,
 
 679 So.2d 278
 
 , 285 (Fla. 1996) ("We hold that plaintiffs' compliance with the presuit investigation requirements of chapter 766 prior to filing suit and within the statutory limitations period constituted sufficient compliance with the presuit notice and investigation requirements of the statute.").
 

 The trial court and the parties in this case all appear to have conflated the present-tense "duly and regularly engaged" requirement of section 766.202(6) with the separate requirement in section 766.102(5)(a) 2. regarding whether the person devoted professional time to the active clinical practice of the specialty during the three years immediately preceding the alleged
 malpractice. Indeed, they all seemingly understood the sole relevant inquiry to be whether Dr. Thompson was engaged in the full-time, active practice of medicine during that three-year period (either at some point in time or throughout that period).
 

 This exclusive focus on a lookback period is likely attributable to the First District's decisions in
 
 Fort Walton Beach Medical Center, Inc. v. Dingler
 
 ,
 
 697 So.2d 575
 
 (Fla. 1st DCA 1997), and
 
 Baptist Medical Center of Beaches, Inc. v. Rhodin
 
 ,
 
 40 So.3d 112
 
 (Fla. 1st DCA 2010). The reasoning of these cases on this point should be rejected.
 

 In
 
 Dingler
 
 , the First District examined the definition of "medical expert" found in section 766.202(5), Florida Statutes (1991), and specifically rejected the defendants' argument that a presuit "medical expert" was required to be duly and regularly engaged in the practice of the profession "at the time the corroborating opinion and affidavit are signed."
 
 Dingler
 
 ,
 
 697 So.2d at 580
 
 .
 
 Dingler
 
 erroneously conflated sections 766.102 and 766.202 by concluding that the present-tense "duly and regularly engaged" requirement in section 766.202 was satisfied "so long as the expert's 'active involvement' in the practice occurred" within the lookback period "as provided by" section 766.102(2).
 

 Id.
 

 More recently in
 
 Rhodin
 
 , the First District cited
 
 Dingler
 
 with approval in rejecting the defendant's challenge to the affidavit provided by the presuit "medical expert," Dr. Byrne.
 
 Rhodin
 
 ,
 
 40 So.3d at 118
 
 . And in rejecting the defendant's specific argument that Dr. Byrne was not "duly and regularly engaged" in the practice of nursing, the First District again erroneously conflated that statutory requirement in section 766.202 with the "devoted professional time" requirement in section 766.102.
 

 Id.
 

 at 119-20
 
 .
 
 Rhodin
 
 failed to consider the fact that in 2003, the Legislature adopted a definition of "medical expert" in section 766.202 that not only retained the "duly and regularly engaged" language but also provided that a presuit "medical expert" must
 
 also
 
 "meet[ ] the requirements of an expert witness as set forth in s. 766.102."
 
 See
 
 ch. 2003-416, § 58, at 76, Laws of Fla. The 2003 amendments make clear beyond any doubt that the "duly and regularly engaged" requirement in section 766.202 and the "have devoted professional time" requirement in section 766.102 are not one and the same. Conflating the two requirements renders the "duly and regularly engaged" language a nullity.
 
 See
 

 State v. Goode
 
 ,
 
 830 So.2d 817
 
 , 824 (Fla. 2002) ("[A] basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless.").
 

 II. DR. THOMPSON'S INSUFFICIENT AFFIDAVIT
 

 Even assuming that Dr. Thompson's activities during the three years immediately preceding the alleged malpractice in this case should control whether this case is permitted to proceed, I would approve the First District's decision.
 

 In determining that the proper standard of review is de novo, the majority repeatedly remarks that the facts surrounding Dr. Thompson's qualifications were "unrefuted." In doing so, the majority ignores that Dr. Thompson's affidavit was problematic on its face, the facts were in dispute, and the plaintiff and plaintiff's counsel-both leading up to and during Dr. Thompson's court-authorized deposition-obstructed the defendants' requests for relevant information. This case hardly
 involved "a fishing expedition in an attempt to impeach" Dr. Thompson's qualifications. Majority Op. at 1159 (quoting
 
 Morris
 
 ,
 
 189 So.3d at 351
 
 (Swanson, J., dissenting) ).
 

 According to Dr. Thompson's affidavit, she "engaged in full-time patient care until March 2008" when she retired due to arthritis in her hands. According to the very same affidavit, Dr. Thompson received her J.D. in 2007 and her M.P.Aff. (Master of Public Affairs) in 2008, both from the University of Texas. In other words, at the same time she was purportedly still caring for patients on a "full-time" basis, Dr. Thompson was also enrolled on a
 
 full-time
 
 basis in law school and in a Master of Public Affairs program. In addition to begging obvious questions, not the least of which is how it is humanly possible to simultaneously do all of those things, Dr. Thompson's affidavit facially conflicted with then Standard 304(f) of the American Bar Association's Standards for Approval of Law Schools, which prohibited full-time law students from working more than twenty hours per week. Any reasonable defense attorney-and any reasonable trial judge, as was the case here-would have been skeptical. And when the plaintiff chose to respond to the defendants' requests for information-both with regard to Dr. Thompson and other matters-the answers were either nonresponsive or begged more questions. For example, the defendants were told that Dr. Thompson somehow managed to deliver approximately
 
 thirty-five babies per month
 
 while she was enrolled full-time in law school and in a master's program. It should go without saying that the trial court acted within its discretion in authorizing limited discovery directed at Dr. Thompson's activities during the three-year period preceding the alleged malpractice. And that discovery included a properly noticed deposition of Dr. Thompson along with a request for documents to be produced at the deposition.
 

 The record reflects that the plaintiff waited until approximately ninety minutes before the deposition to file an objection to the defendants' request for documents. The record also reflects that during the deposition, the plaintiff's counsel repeatedly objected-and instructed Dr. Thompson not to answer-when certain relevant questions were asked regarding Dr. Thompson's purported activities during the three-year period preceding the alleged malpractice. When Dr. Thompson was permitted to answer questions, she testified that, among other things, she "probably" worked "more than" one hundred hours per week between her practice and her J.D. and M.P.Aff. degrees. That included being on call for unaffiliated patients at the hospital two to three days per month, as well as being on call for her own patients every third to fourth night or day until the final year of her practice when she "took call ... 24/7" for her own patients-all while suffering from arthritis in her hands that became "severe" in the final years of her practice. Of course, Dr. Thompson was not permitted to answer, for example, whether she filed for disability with regard to her arthritis and, if so, whether the application-which would have discussed her work history-was available for inspection. Similarly, Dr. Thompson was instructed to not answer questions such as whether she was aware of any requirements by her law school regarding not working outside the law school more than twenty hours per week, although her subsequent testimony implied that the dean of the law school knew and approved of her plan to continue practicing OB/GYN on a "full-time" basis-again, notwithstanding the American Bar Association's Standards for Approval of Law Schools. Dr. Thompson also was not permitted to discuss whether her compensation from and the finances of her medical
 practice changed as a result of her starting law school. That was the case even though Dr. Thompson revealed earlier in the deposition that she had hired "a contract physician" "during some of that time" but could not quite recall the specifics of that hire, including when she hired the physician, the terms of payment, or whether the physician had a set schedule for a period of time at least as long as a law school semester. And Dr. Thompson was not permitted to answer whether she at some point sold her practice to that contract physician.
 

 On this record, I disagree with the majority's description of the defendants' attempts to confirm the claims made by Dr. Thompson as being "a fishing expedition." Majority Op. at 1159. And I reject the majority's view that Dr. Thompson's affidavit conclusively established her statutory qualifications. The true extent of Dr. Thompson's activities during the relevant period remains very much in doubt. I therefore disagree with the majority's analysis, which is entirely predicated on the assertions that Dr. Thompson clearly met the statutory requirements and that her affidavit went "unrefuted." This case should properly be viewed as a case in which a facially insufficient affidavit was submitted and the defendants were prevented from determining whether Dr. Thompson in fact met the statutory requirements. And no case law supports allowing a medical malpractice suit to proceed in the absence of a timely corroborating affidavit from a presuit "medical expert" as defined in section 766.202(6).
 

 In attempting to justify its decision, the majority notes that the presuit statutes should be "interpreted liberally" so as to favor access to courts.
 
 See
 
 majority op. at 1151 (quoting
 
 Kukral
 
 ,
 
 679 So.2d at
 
 284 ). But this case has nothing to do with roadblocks to court access. Instead, this case has to do with a plaintiff submitting a facially insufficient and suspect affidavit and then repeatedly declining-even in the face of a court-imposed order-to provide relevant information that would have confirmed or refuted the affidavit. "Liberally" interpreting the presuit process does not warrant allowing plaintiffs to obstruct defendants from obtaining relevant information regarding questionable claims and then rewarding that obstruction through an analysis that treats those claims as "unrefuted." The majority's decision to simply reinstate the plaintiff's suit seriously undermines the presuit process established by the statute.
 

 III. CONCLUSION
 

 Although the plaintiff's purported presuit "medical expert"-Dr. Thompson-appears to have enjoyed a lengthy career as an OB/GYN, she did not meet the statutory qualifications for a "medical expert," given that she was not "duly and regularly engaged" in the practice of the profession at the time she executed the presuit affidavit. The plaintiff thus failed to meet the presuit burden of having corroborated that reasonable grounds existed to support a malpractice claim, and the plaintiff failed to remedy that defect prior to filing suit and prior to the expiration of the limitations period. Even assuming that the only relevant period is the three years immediately preceding the alleged malpractice, the record before us-due to the conduct of the plaintiff and plaintiff's counsel-cannot support the finding that Dr. Thompson met the statutory qualifications. I would approve the result reached by the First District in affirming the dismissal of the plaintiff's complaint. Accordingly, I dissent.
 

 POLSTON and LAWSON, JJ., concur.
 

 The majority concludes that "[t]here is no indication that the Legislature ... intended to make the qualifications for a presuit expert more stringent than an expert testifying at trial." Majority Op. at 1153. But that conclusion ignores the text of section 766.202(6), which, by definition, provides that a presuit "medical expert" must meet certain requirements in addition to those for an expert testifying at trial.
 
 See
 
 § 766.202(6), Fla. Stat.
 

 The majority dismisses the notion that Dr. Thompson was required to "be duly and regularly engaged at the time the opinion is offered" in part on the ground that "the role of the medical expert is to provide an opinion regarding the prevailing professional standard of care, or the professional standard of care existing
 
 at the time of the occurrence that is the basis for action
 
 ." Majority Op. at 1154 (emphasis added). But even assuming that Dr. Thompson was only required to be "duly and regularly engaged" in the practice "at the time of the occurrence," she still would not meet the statutory requirement. As the majority recognizes, Dr. Thompson "retire[d] from clinical practice in March 2008," majority op. at 1148, "which was several months before the incidents alleged in the complaint began," majority op. at 1156.